## Jones Estate

*Thomas V. Douglass* and *Thomas J. Jackson* of *Griggs, Moreland, Blair & Douglass*, for accountants.

*P. K. Motheral, Joseph G. Robinson, David M. Gilmore* and *Mason Walsh* of *Reed, Smith, Shaw & McClay, J. Garfield Houston* of *Blaxter, O'Neil, Houston & Nash, David B. Buerger, Glenn B. Reed* and *Jack G. Armstrong* of *Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Robert L. Kirkpatrick* of *Kirkpatrick, Lockhart, Pomeroy & Johnson* and *William F. Knox* and *Davis C. Burroughs, Jr.,* of *Moorhead & Knox,* for claimants.

WOLK, J., April 6, 1962.—Benjamin F. Jones died testate on May 19, 1903, having made his last will and testament dated January 15, 1903. He was survived by his wife, Mary McM. Jones and four children, to wit, Mary F. Laughlin, Elizabeth M. Horne, Alice J. Willock, and Benjamin F. Jones, Jr.

William C. Robinson, Benjamin F. Jones, III, and William R. C. Ford, surviving and successor testamentary trustees of the estate of Benjamin F. Jones, deceased, in trust for Franklin J. Horne, now deceased, filed an eleventh and final account which came before this court for audit on June 16, 1960. William C. Robinson did not sign the account or the petition for distribution because of advanced age and illness, and he has since died at the age of 94. All parties involved agree that the account and the supplemental accounts are properly stated and are true and correct.

This case involves the question of the violation of the rule against perpetuities in the one equal fifth part or portion of the residuary estate under which testator's daughter, Elizabeth M. Horne, is given the income for life and upon her death provision is made for each of her children for equal portions of said one-fifth part for life or in remainder upon marriage and issue born, as more particularly set forth hereinafter.

Elizabeth M. Horne died January 10, 1939. She was born September 29, 1862. She was survived by three children, the only children born to her and all born in the lifetime of testator.

One child is Madelaine Horne Austin, born in 1893, and who died June 2, 1951. When her mother died, she had married and had issue born of her marriage, and she was awarded her one-third portion of the corpus of the one-fifth part of testator's residuary estate. Mrs. Austin was survived by four children, all now living.

Another child is Elsa Horne Voss, who was born in 1895, and is still living. When her mother died, she

had married and had issue born of her marriage, and she was awarded her one-third portion of the corpus of the one-fifth part of testator's residuary estate. Mrs. Voss had one child who is still living.

Franklin J. Horne, a son, was born April 22, 1899, and he died July 25, 1959. At his mother's death, he was unmarried but since her death he married but had no issue born, and he is survived by a wife, Mrs. Frances H. Horne, who is also executrix of his estate, and an adopted son, Laurent Novikoff Horne, who was adopted at the age of 21, on March 9, 1959.

The question of the violation of the rule against perpetuities with respect to Franklin J. Horne's one-third share was not raised at the audit of the account. A serious question later arose in a discussion with this court as to whether Mrs. Voss, alone, was entitled in remainder to the one-third portion from which Franklin J. Horne received the income during his life, or whether the one-third portion should be divided equally between Mrs. Voss and the estate of Mrs. Austin; and the further question arose as to whether the four children of Mrs. Austin should take her share directly without that share passing first through her estate. The Mellon National Bank and Trust Company and Philip S. P. Fell are executors of Mrs. Austin's estate in New York. After considerable time and extensive negotiations, a settlement was made, as more particularly set forth in a petition for approval of settlement agreement, which petition was presented to this court on December 22, 1961.

A hearing date to pass upon the petition for approval of the settlement agreement was set for January 24, 1962, which was continued to February 15, 1962. David B. Buerger, Esq., representing the estate of Franklin J. Horne, deceased, raised the question of the violation of the rule against perpetuities and asserted that if there was a violation the estate of Franklin J.

Horne, deceased, was entitled to the entire balance for distribution, or at least an intestacy would result from said violation.

The hearing on February 15, 1962, was continued to March 16, 1962, when all briefs and reply briefs were to be in the hands of the court. An argument was held on February 15, 1962, as well as on March 16, 1962.

The court raised the question that only six days' notice was given for the February 15, 1962, hearing, rather than ten days, and the hearing on March 16, 1962, was continued to April 6, 1962, and the trustees were directed to properly notify all the parties in interest of the April 6, 1962, hearing giving at least ten days' notice. This was done.

Now let us examine the will of testator, in order to determine what the reported cases refer to as the testator's "plan of distribution", or the "organic plan of the testator."

Under paragraphs first, second and third, testator gave, devised and bequeathed to his wife certain real estate and certain personal property.

Under paragraph fourth, he gave his wife $10,000.

Under paragraph fifth, he bequeathed to his wife certain real estate for life.

Under paragraph sixth, he gave to his wife for life dividends, interest, and income in certain stocks and bonds.

Under paragraph seventh, he gave his wife the power to sell and reinvest stocks and bonds set forth in paragraph sixth and to continue to receive the interest and dividends.

Under paragraph eighth, the trustees thereinafter named, after the death of testator's wife were to hold the real estate and the stocks and bonds enumerated in paragraphs fifth and sixth, as well as the stocks and bonds purchased and held during the lifetime of his

wife in lieu thereof, and to pay the net income of said real estate and stocks and bonds, or the proceeds thereof, unto his four children, to wit, Mary F. Laughlin, Elizabeth M. Horne, Alice J. Willock, and Benjamin F. Jones, Jr., in equal shares for and during the full time and period of each of their natural lives.

Paragraph eighth further provides, as follows:

"Should any one of my said children die before their Mother, or during the continuance of this trust, leaving issue surviving, then such issue shall take and receive, in equal shares, the share and portion of said net income of such deceased parent, to be enjoyed by such issue until the death of the last one of my said four children. The share and portion of said net income of any of my said children dying either before their Mother or before the expiration of this trust, without issue surviving, him, her or them, shall go to and belong to my surviving child or children in equal portions for and during the period of his, her or their natural life or lives." . .

Paragraph ninth provides as follows:

"Ninth: When the last of my said four children shall die, the said pieces or parcels of real estate, enumerated in the Fifth Paragraph and the stocks and bonds enumerated in the Sixth Paragraph of this my Will, or the principal of the proceeds of said real estate, if the same be sold in the meantime, or the stocks and bonds purchased in lieu of those named, or the principal of the proceeds thereof, if the same be sold in the meantime, I give, devise and bequeath unto all my grandchildren living at the time of the death of the last one of my said four children, to be divided among all my said grand children in equal parts or portions."

Paragraph tenth gives an annuity of $1,000, for life, to his brother, G. A. Jones.

Paragraph eleventh gives an annuity of $1,000, for life, to his sister, Caroline Donaldson.

Paragraph twelfth contains the residuary clause involved in this case and omitting the provisions for the sisters of Mrs. Elizabeth M. Horne, said paragraph reads as follows:

"Twelfth: All the rest, residue and remainder of my estate, real and personal, I dispose of in manner following, to wit: One equal fifth part or portion thereof, I give, devise and bequeath unto my wife Mary McM. Jones, her heirs and assigns, absolutely; one equal fifth part or portion thereof, I give, devise and bequeath unto my son Benjamin F. Jones Jr., his heirs and assigns absolutely; . . . One equal fifth part or portion of my said residuary estate, I give, devise and bequeath unto my Trustees hereinafter named, or the survivor, or survivors, *in trust*, however, for the following uses and purposes, to-wit: to invest, use, manage and control the same and collect the rents, issues and profits, income, interest and dividends thereof, and pay over the net income therefrom arising, monthly or quarterly as is most convenient, to my said daughter Elizabeth M. Horne, for and during the full term and period of her natural life. Upon the death of my said daughter Elizabeth M. Horne, I direct my said Trustees or the survivor, or survivors, or the successors in this trust, to pay over to each of the children of my said daughter who at her death shall be married and have issue living, or to the issue of any child or children of hers who may then be dead, his, her, or their equal portion or portions of the principal of the said one-fifth part of my residuary estate. Upon the death of my said daughter Elizabeth M. Horne, if she leaves a child or children, surviving, unmarried or married and without issue living at the time of my said daughters death, my said Trustees, or the survivor, or the successors in this trust, are directed to pay over to such child or children of hers the net income of his, her or their portion or portions of the principal of the one fifth

part of my said residuary estate, until such child or children of my said daughter shall marry and have issue born, or being already married have issue born, when and at which time, he, she or they shall severally be entitled to and shall receive from my said Trustees, his, her or their respective portion or portions of the principal of said one fifth part of my residuary estate. Should any of the children of my daughter Elizabeth M. Horne, die unmarried or without issue of a marriage, or married and without issue born, the share and portion in the principal of the one fifth part of my residuary estate of such child or children of hers so dying, shall go to and belong to the surviving child or children of my said daughter who at that time have married and have had issue born. Should all the children of my said daughter Elizabeth M. Horne, die unmarried and without issue, then the principal of the whole of said one fifth of my residuary estate shall go to and belong to my surviving children, if any, and to the issue of a deceased child or children of mine, such issue to take the part or portion of said one-fifth part of my residuary estate, his, her or their parent or parents would have been entitled to. Should my said daughter Elizabeth M. Horne die, leaving no issue surviving her, or issue of any issue, then the said one fifth part or portion of my residuary estate shall revert to and become part of my residuary estate, and be distributed in accordance with the terms of this my will with respect to my residuary estate." . . .

The provisions for testator's daughters, Mary F. Laughlin and Alice J. Willock, are identical with the provision set forth above for Elizabeth M. Horne.

An analysis of the will of testator and particularly the provisions in the residuary clause for testator's three daughters becomes significant in determining testator's "plan of distribution" or the "organic plan of the testator," which matters are considered of prime

importance in the case of Harrah Estate, 364 Pa. 451 (1950), which case differs from the earlier cases, for the reason that in the beginning and for many years thereafter, in construing a will with reference to a violation of the rule against perpetuities, the intent of the testator was of no effect.

Aside from his wife and the two small annuities to his brother and sister, testator was concerned only with those of his blood in direct descent, children and grandchildren. His three daughters are treated exactly alike. His son is given the same share as is provided for his daughters and their children, except that his share in the residuary clause is given to him outright without any conditions. As to his three daughters, testator expressed a very laudable purpose in that he desired his grandchildren to be married and have issue born if they were to receive their portion of the corpus of which their mother received the income.

Once his son received his share or his grandchildren their shares, he was not concerned with what they did thereafter. Clearly, there was no dominant purpose to postpone vesting unlawfully.

In the beginning, Pennsylvania followed the strict common law rule against perpetuities and held that an interest must vest within a life or lives in being and 21 years allowing for the period of gestation, or it was void. The remoteness is measured by possible rather than actual events: Warren's Estate, 320 Pa. 112 (1936).

The rule against perpetuities was judicial-made law adopted as a matter of public policy for the welfare of society. Judge Stearne, afterwards Mr. Justice Stearne of our Supreme Court, and who was a member of the Supreme Court when Harrah Estate, supra, was decided, in the part of his opinion set forth in Warren's Estate, supra, page 113, had this to say historically about the rule against perpetuities:

". . . The rule, which for centuries has had much learning and effort expended in its application, was one of the methods adopted by the judiciary, in the interest of public policy, to prohibit the undue limitation and prolongation of estates. Mr. Gray in his learned treatise, The Rule Against Perpetuities, says (page 2), that the rule is a mode 'adopted by the common law for forwarding the circulation of property which it is its policy to promote.' Without attempting to trace the development of the rule, it will suffice to say that the limit, under the rule, for the creation of executory interests to commence, is 'within the period of a life or lives in being and twenty-one years, allowing for the period of gestation.' It should be noted that it matters not how many lives there may be 'so that the candles are all burning at the same time,' for the longest liver is but a single life."

In Volume IV, Restatement of the Law of Property, there is a historical discussion of the rule against perpetuities. On page 2132, there is a concluding paragraph, as follows:

"From this review of diverse purposes served by the rule against perpetuities, it is fair to conclude that the social interest in preserving property from excessive fettering rests partly upon the necessities of maintaining a going society controlled primarily by its living members, partly upon the social desirability of facilitating the utilization of wealth, partly upon the social desirability of keeping property responsive to the current exigencies of its current beneficial owners, and partly upon the competitive basis of modern society."

Since the rule against perpetuities has been relaxed in England and in the United States, particularly in Pennsylvania, it is necessary to keep in mind that the welfare of society may demand a further relaxation of the rule against perpetuities, and the legislature of Pennsylvania has done so by the enactment of the Es-

tates Act of April 24, 1947, P. L. 100, sec. 4(b), which provides that the validity of limitations in remainder should be "measured by actual rather than possible events."

Since Benjamin F. Jones died in 1903, the Act of 1947 does not apply. However, the application of the Act of 1947 is not necessary for the determination of this case. The Supreme Court in Harrah Estate, supra, has further relaxed the rule against perpetuities to comply with the philosophy behind its rulings that valid life estates can be separated from invalid remainders, so that valid remainders now can be separated from invalid remainders.

In passing, it may be noted that in Warren's Estate, supra, as in the early case of Lawrence's Estate, 136 Pa. 354 (1890), where the question involved was the creation of a future interest by the donee of a power of appointment exercised in donee's will, the remoteness of the appointed estate is still measured from the time of the creation of the power, but it is the fact and not the possibility which rules.

It is the opinion of this writer that Harrah Estate, supra, disposes of the case at bar. Mr. Buerger, counsel for the estate of Franklin J. Horne, argues that the facts are different in the case at bar, in that the life tenant's share in the Harrah case goes in remainder to the heirs and next of kin of the life tenant, while in the case at bar the remainder goes to the sister or sisters of the life tenant. Mr. Buerger relies on the example in section 389, of the Restatement of the Law of Property, which sets forth the usual situation and which applies to the Harrah case. He completely overlooks the fact that section 389, which covers one printed page in the Harrah opinion, is not discussed before or after the quotation, and he neglects to note the nine printed pages of that excellent opinion by the late Mr. Chief Justice Maxey, which lays the foundation for the

principle that valid remainders can be separated from illegal remainders on the philosophy behind the separation of valid life estates from illegal remainders.

Section 389 will be discussed later in this opinion.

Before discussing Harrah Estate, supra, it is interesting to note in Lawrence's Estate, supra, decided in 1890, that Mr. Justice Clark states on page 363, as follows:

"The rule, as stated in Gray on Perpetuities, is as follows: 'No interest, subject to a condition precedent, is good, unless the condition must be fulfilled, *if at all*, within twenty-one years after some life in being at the creation of the interest . . .' " (Italics supplied.)

In the case at bar, the remainder interests of Mrs. Voss and Mrs. Austin must vest, *if at all*, within the rule against perpetuities for the reason that both Mrs. Voss and Mrs. Austin and their brother, Franklin J. Horne, were all born in the lifetime of testator and there were no other children born to Elizabeth M. Horne after testator's death. Mrs. Voss and Mrs. Austin had a contingent interest in the remainder of their own one-third portion, but since they were married and had issue born at the time of their mother's death, their interest in the remainder of their own one-third portion vested and they each received the corpus of their one-third interest on their mother's death. It follows very definitely that since Mrs. Voss and Mrs. Austin had married and had issue born at the time of their mother's death, they had then a vested interest in the remainder of Franklin J. Horne's one-third portion subject to be divested if Franklin had issue born, in which event he would have received the corpus of his one-third portion. See Straus Estate, 351 Pa. 136 (1945), and Vandergrift Estate, 406 Pa. 14 (1962). But even if this were not so, Mrs. Voss having survived her brother, the remainder would vest in her at his death.

In Harrah Estate, supra, testator by trust gave income to his son, George, for life, then to pay the income thereafter to the son's children "and upon the death of any of such children, to distribute his or her share of said principal sum according to the intestate laws of Pennsylvania." George Harrah died in 1908, with four children surviving, all of whom were alive when testator died. One of the four children, Julius, died in 1948, the trust continuing for the benefit of the others who were still living. The controversy was over the one-fourth share which terminated with the death of Julius.

The auditing judge held that the remainders to the heirs and next of kin of Julius violated the rule against perpetuities. He cited favorably the decisions in Pennsylvania permitting horizontal separation, i.e., the separation of valid life estates from invalid remainders, but none the less felt compelled to follow the state of the law in Pennsylvania.

Mr. Chief Justice Maxey, on page 457 of Harrah Estate, supra, quotes from the opinion of the auditing judge as follows:

" '. . . We reach this conclusion regretfully because it not only frustrates *the intention of the testator*, but results in an awkward and diffused distribution to widely scattered persons, some of whom are, no doubt, strangers to the testator's blood, instead of to the three children of the deceased life tenant, who are the natural objects of testator's bounty and were obviously intended to be the recipients of the share from which their deceased parent received the income.' " (Italics supplied.)

The court en banc, in its opinion, shares the regrets of the auditing judge as stated on page 457 of Harrah Estate, supra, as follows:

"The Court's opinion, upon the exceptions to the adjudication, said, inter alia: 'We share in his [the Audit-

ing Judge's] regrets that the application of the rule in this case results in an award to the testator's next of kin rather than to those of the deceased grandchild. The change of public policy evinced by the Estates Act of 1947, Section 4, wherein the rule of remoteness must now be measured by actual rather than possible events, so far as instruments becoming effective after January 1, 1948, are concerned, makes our decision the more regrettable, *but only the Supreme Court can overrule the former decisions which control us, and so bring about a desirable uniformity of construction that could be applied to all instruments, whether effective prior to or after January 1, 1948.*' The adjudication was then confirmed absolutely." (Italics supplied.)

Then the Supreme Court, through Mr. Chief Justice Maxey, states on pages 457-458, as follows:

"We find no reason in logic or in *public policy* why the whole remainder should be adjudged void because the remainder to the heirs of George's hypothetical child born after testator's death would violate the rule against perpetuities. The remainder of the shares held for such of George's children as were living at the time of his death are clearly valid. We have upheld life estates as valid even though the remainder was found to be invalid. In Kern's Estate, 296 Pa. 348, 145 A. 824, the question arose as to whether certain provisos in a will breached the rule against perpetuities 'since it might have eventuated that the power of appointment vested in female grandchildren could not, in some instances, have been exercised until a period had elapsed sufficient in length to outlaw the power. We said: 'The weakness in appellants' contention is in treating the testamentary provisions for decedent's daughters and those for his granddaughters as though they were inseparable. Gray, in his "Rule against Perpetuities" (3d ed., p. 342) states, *"When gifts are made to several persons by one description, but the amount of the gift*

*to one is not affected by the existence or nonexistence of the others, then the gifts are separable"; again he states (p. 343), "Although the amount of each legacy is dependent upon the number of legatees, yet, if this number must be determined within the required limits, the gifts are separable"; still again (p. 345), "When, on a gift to a class, the number of shares is definitely fixed within the time required by the rule against perpetuities, the question of remoteness is to be considered with reference to each share separately."' "* (Italics supplied.)

Mr. Chief Justice Maxey continues on page 459, as follows:

"In the instant case the testamentary disposition involves a class gift to life beneficiaries, which is clearly valid, and separate remainders over, of that portion of the corpus for which each life beneficiary had received the income. All of the children of testator's son George, including Julius, were born in the lifetime of the testator, and since, in fact, there were no children born to George after the death of the testator, *it would be an extreme and socially unwise application of the Rule against Perpetuities to hold that all the gifts in remainder were void as violative of that rule.*" (Italics supplied.)

Then on pages 462-463, Mr. Chief Justice Maxey states the climactic argument and conclusion which is sufficient to decide the case at bar:

"That the decisions of this Court have, in applying the Rule against Perpetuities separated valid life estates from invalid remainders is conceded. In Quigley's Estate, 329 Pa. 281, 198 A. 85, we said: 'Ordinarily the validity of prior limitations is not affected or disturbed by reason of ultimate ones which transgress the rule against perpetuities. There is a well nigh continuous current of authorities in Pennsylvania establishing this principle: (citing numerous cases).' In

that case we cited the following from McCasky's Estate, 293 Pa. 497, 508, 143 A. 209, saying that it would be better to inquire whether ' "the striking down of the void gifts would, in vital matters, *so emasculate his (the testator's) plan of distribution, as to render it reasonably certain he would not have made the will in the way he did had he known it could not be sustained in the respects in which it must be set aside."* ' We added: 'Such a test makes the question analogous to the familiar subject whether the remaining portions of a statute should be held valid and in effect after part of the act has been declared to be unconstitutional.' We also said in Quigley's Estate: '. . . none of the factual circumstances (here) exist which would justify a judicial invalidation of the prior life estates as being inextricable parts of a frustrated testamentary purpose,' and that to separate these bequests would not defeat *'the organic plan of the testator.'* The separability which we thus applied is sometimes referred to as 'horizontal separability.'

"*The rationale of the Quigley case applies here.* There is no reason why, in determining whether a testamentary provision is void as to a remainder to the heirs of a hypothetical child of the cestui que trust, which child might possibly have been born after the death of the testator whose will created the trust, this court should not apply the doctrine of separability as to the remainders of the heirs of each child of the cestui que trust, which later children were living when the testator died. In upholding those remainders which are legal because not violative of the rule against perpetuities we are not defeating the *'organic plan of the testator.' That separation of legal remainders from illegal remainders may be called 'vertical separability.'*

"There is no legal compulsion for us to sustain (and it would be unjust if we did so) the attack which is here made upon the whole remainder under testator's

will because (1) a gift of income to George's 'children' would have included such a child born after the testator's death and (2) the remainder to the heirs of that hypothetical child is violative of the rule against perpetuities. We decide that the successive remainders provided for in the will of Charles J. Harrah to the heirs of the various children of his son, George W. Harrah, living when the testator died are separable from the remainder to the heirs of a possibly 'after born' child of George W. Harrah." (Italics supplied.)

It is the opinion of this writer that this climactic argument and conclusion by Mr. Chief Justice Maxey once and for all eliminates the rightful judicial lament of the auditing judge and the court en banc in Harrah Estate, supra, and made it unnecessary to base the conclusion on the Estates Act of 1947.

As in the case at bar, the remainder to a hypothetical after-born child was held to have no effect on valid remainders which had to vest within a life or lives in being and 21 years, if at all.

In the case at bar, there is not the slightest doubt that if the contention of Mr. Buerger were sustained, this conclusion would so emasculate testator's plan of distribution as to render it reasonably certain he would not have made the will in the way he did had he known it could not be sustained in the respects in which it must be set aside. Throughout his will testator was only concerned about children and grandchildren, and certainly in the Elizabeth M. Horne trust he was only concerned about his daughter and her children, with the only remainder condition that the grandchildren marry and have issue born.

Mrs. Voss and Mrs. Austin were married and had issue born at their mother's death. They fulfilled the very laudable condition and purpose of testator. By disregarding the hypothetical afterborn child, testator's "plan of distribution" or the "organic plan of

testator", as stated in Harrah Estate, supra, are completely fulfilled.

At the time testator created the testamentary trusts, his daughter and three children of the daughter were living. Testator's immediate solicitude was for the welfare of his daughter and his grandchildren. There is no apparent ulterior motive to defer distribution to some remote fixed time as an end in itself. The life estate for the daughter and the provisions for the daughter's children were the primary objects of testator.

Mr. Chief Justice Maxey cites the case of Smith's Estate v. Commissioner of Internal Revenue, 140 F. 2d 759 (1944). On page 764, Judge Goodrich states as follows:

"We do not hesitate to conclude that, if the settlor knew that the trust would be held void as to the children of her daughter's children who would be born after the trust was executed, she would have nevertheless intended the valid portions of the trust should remain intact."

We do not hesitate to conclude that, if testator knew that the trust would be held void as to a child of his daughter born after testator's death, he would have nevertheless intended the valid portions of the trust should remain intact. In the case at bar there was no after-born child, but a hypothetical child that might have been born. The intention of testator is completely fulfilled.

The Supreme Court's opinion in Harrah Estate, supra, makes it clear that section 389 of the Restatement was not the sole reason for the decision. Section 389 is separately set forth with no language in the opinion to indicate that it serves as any more of a basis for the decision than any of the other grounds given. The general rule set forth in section 376 of the Restatement, and referred to in section 389, does not

purport to limit the doctrine of separation to any specific circumstances such as those contended for by petitioner.

"Section 376. Separable Limitations.

"The validity of each separate limitation is determined separately under the rule against perpetuities."

One of the comments to section 376 is important.

"d. Separability—Separate shares. The dispositive provisions of a deed or will also are separable into separate limitations, when the instrument separates an aggregate of assets into shares and disposes of the shares separately. Thus when a limitation limits property to one person for life, (as for example, to the wife of the testator), and then splits it into separate shares (as for example, one share for each of the children of the testator) making further limitations which may be identical, or may be different, as to each share, then the rule against perpetuities is separately applied to the limitation made with respect to each separate share (See Illustration 2) . . ."

Comment g, to section 389, indicates that deviations may occur from the strict pattern set forth in that section and the limitation would then be governed "by an analogous rule under which the validity of the entire ultimate disposition attempted with respect to each severed share 'is determined separately under the rule against perpetuities'."

Section 389 does not state a rule for determining whether class remainders are valid, it only states that remainders limited as provided in the section are separable.

The comments to section 389, at page 2287, point out that the general rule for determining whether remainders are separable is stated in section 376, and section 389 deals only with one form of disposition frequently encountered in wills. Following the general

rule stated in section 376, and in the intervening sections prior to section 389, various types of separable remainders are discussed. Naturally, the court cited section 389, because it happened to involve the same form of disposition as that appearing in the Harrah Estate.

Section 389 is merely a specific application which the writers of the Restatement felt occurred with enough frequency and which is the usual case and which required a particular section covering the situation.

In addition to the cases from other jurisdictions discussed by the Supreme Court in Harrah Estate, supra, there is a recent important decision by the Supreme Judicial Court of Massachusetts. In Second Bank-State Street Trust Co. v. Second Bank-State Street Trust Co., 335 Mass. 407 (1957), settlor, by irrevocable inter vivos trust gave the income to himself for life, then to his wife for her life, then the income to go to the settlor's children and the issue of any deceased child, the trust to be determined 21 years after the death of the last survivor of the settlor's children, and the corpus to be distributed among such issue per stirpes. The share of any chilld who might die without issue was to be held in trust for the equal benefit of the surviving children and the issue of any deceased child. While no further children were born to settlor after the creation of this trust, the possible violation was that a child of settlor born after the trust was created might be the last of his children to die, thus prolonging the vesting longer than the period permitted by the rule.

The court held this trust to be governed by the doctrine of "severed shares" in that a separate share was set up for each child of the settlor and such child's issue, with the devolution of each share to be dealt with separately. As to the children of settlor alive when the trust was created, all remainder interests

would vest within the rule and were unaffected by the possibility that the remainder to the issue of an after-born child might not vest within the time allotted.

This case is like the will of Benjamin F. Jones, in that the share of any child who might die without issue was to be held in trust for the equal benefit of the surviving children and the issue of any deceased child. Among the authorities cited in the opinion were Harrah Estate, supra, Smith's Estate v. Commissioner of Internal Revenue Service, supra, and section 389 of the Restatement. While section 389 was cited, it is readily seen that the disposition is not the prototype for which petitioner argues that section is intended.

Additional reasons for the court's decision in that case, all of which apply in the Jones estate, are: (1) The principle that if there are two or more reasonable interpretations of a dispositive scheme, the interpretation leading to a holding of the validity of remainder interests should be adopted, if consistent with the settlor's intention and the public policy behind the rule; section 375 of the Restatement; also section 243, comment n; (2) settlor used the word "share" frequently, showing he intended to set up a separate share of the trust property for each child; (3) the maximum number of shares would inevitably be settled within the period required by the rule against perpetuities.

It is interesting to note the case of Smith Estate, 73 D. & C. 38 (1950), where the auditing judge ruled that the remainders to the appointees or next of kin of grandchildren living at testator's death were not separable from the remainder to the appointees or next of kin of a hypothetical after-born grandchild and that all were void under the rule against perpetuities. Exceptions were filed and in the meantime Harrah Estate, supra, was decided by the Supreme Court, and the Orphans' Court of Philadelphia County was compelled to reverse its conclusion. The court said, on page 41:

"It is argued in support of the adjudication that the rule of Cattlin v. Brown and A. L. I. Restatement of the Law of Property §389, adopted in Harrah Estate, is limited to cases where the remainder is given to issue or heirs of each secondary life tenant; that the present will differs in an important respect in that testator gave to each grandchild *a general testamentary power of appointment* preceding the gift in default of appointment to its next of kin.

"It is true that in the facts of these cited authorities there is no power of appointment, but neither is it stated that the presence or absence of a power would affect the application of the rule."

It is the opinion of this writer that the Supreme Court in the last two pages of its opinion in Harrah Estate, supra, very clearly set forth that it was not deciding Harrah Estate merely on the basis of section 389, but it was adopting the rationale of the Quigley case cited therein. Now it is definitely decided without regard to the Estates Act of 1947, that the philosophy behind the rationale of the separation of valid life estates from invalid remainders is now the philosophy behind the separation of valid remainders from invalid remainders.

Public policy and the social welfare were the basis for the adoption of the rule against perpetuities by the judiciary. Public policy and the social welfare do not demand that the remainders in the case at bar be declared invalid nor do they demand that testator's "plan of distribution" or "the organic plan of the testator" be frustrated and nullified because of the possible birth of a hypothetical child to Elizabeth M. Horne, daughter of testator. Under this decision said plan is completely fulfilled.

A decree will be entered in accordance with this opinion and in accordance with the settlement agreement presented to this court for approval.

*Decree*

And now, to wit, April 6, 1962, the account in this case having been filed and confirmed nisi and having been examined and audited by the court, upon consideration thereof it is decreed that the account be confirmed absolutely and that the settlement agreement be and is hereby approved and that the funds in the hands of the accountants, to wit, $1,613,482.78, be paid in accordance with the schedule of distribution hereto attached and made part hereof unless exceptions are filed within ten days.